## HUFF et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 6213.

Circuit Court of Appeals, Fifth Circuit.

March 11, 1932.

FOSTER, Circuit Judge, dissenting.

Harry C. Weeks, of Wichita Falls, Tex., for petitioners.

G. A. Youngquist, Asst. Atty. Gen., and Sewall Key and J. P. Jackson, Sp. Assts. to the Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and R. N. McMillan, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before BRYAN, FOSTER, and WALKER, Circuit Judges.

WALKER, Circuit Judge.

The record in this case presents the question whether R. E. Huff and his wife, E. B. Huff, residents of Texas, were entitled to deduct from their gross incomes in 1920, part of which was community income, the amount of a loss which was sustained in the manner indicated below. In the year 1918 R. E. Huff, who was a lawyer and banker, and John S. Mabry entered into a partnership for the conduct of a fire insurance business under the name Wichita Great Western Underwriters, the headquarters of the business being at Wichita Falls, Tex. Under the plan adopted, the partners were to be joint managing attorneys, any person wishing to participate in the business might become an underwriter by subscribing for such amount as he might desire to invest, paying one-fourth

of such amount in cash. Ten per cent. of the cash payments was allowed to the managing attorneys, the balance of such payments to constitute a reserve or trust fund, which was to remain the property of the subscribers, who became severally but not jointly liable for a specified amount of the liability incurred under policies issued. That fund, and the revenues from the investment thereof, were to be used only in paying fire losses in excess of the amount in the association's reserve fund, into which 75 per cent. of the gross premium income was to go, the other 25 per cent. of such gross premium income to be used for expenses. Huff and Mabry as managing attorneys were authorized "to collect, receive and disburse under the supervision of the advisory board all premiums, moneys and funds at any time owing" to the underwriters and policyholders, and were to exercise a general supervision over the affairs of the enterprise and over the investment of its funds. At the end of each year, the underwriters were to be paid 10 per cent. of the gross premiums collected and on the basis of their subscriptions. The profits of the enterprise were to be equally divided between the two partners.

Neither Huff nor the advisory board took any active part in the conduct of the business until the latter part of the year 1920. Up to that time Mabry was actively in charge of the business. In the fall of 1920 Huff, after becoming apprehensive as to the condition of the association, put his son in the association's office to check up on the management of its affairs. Thereafter, in December, 1920, Huff discovered that Mabry, without being authorized to do so, had abstracted a considerable sum of money from the above-mentioned reserve or trust fund, had used $25,000 of that money in paying a debt of the partnership, and that Mabry had been drawing a monthly salary of $1,500, although he was only entitled to draw from $300 to $400 per month. When the unauthorized use of the trust fund was discovered in December, 1920, Mabry was in Missouri. Huff tried to get him back to Wichita Falls, but for a time Mabry would not return. He did come back, however, in January, 1921, and was at once removed as one of the managing attorneys by Huff or at Huff's instigation. The firm of Huff and Mabry then discontinued business. Mabry promised to pay back the money he had taken, but never did so. He owned no property, and a judgment against him would have been worthless. For that reason no action was brought against him to collect the amount. While Huff was trying to determine the exact amount of the defalcation, an inspector from Oregon came into the office to make an examination and report. This greatly interfered with and delayed Huff's examination. The Oregon inspector published a very damaging report in the latter part of December, 1920. As a result of this report, many persons who had given notes for their insurance premiums refused to pay, suits against the association were filed, and it was forced into the hands of a receiver late in February, 1921. Some collections from premiums were made in January and February, 1921. Huff was unable to determine the amount of Huff and Mabry's assets before the close of 1920. On February 16, 1921, the partnership assets amounted to $3,228.65, which Huff then turned over to the association, together with $21,771.35, which he furnished personally. He has never received any reimbursement. R. E. Huff did not keep regular books of account of his affairs, but kept memoranda of his income, losses, interest paid, and like matters. From these he made his income tax returns upon a cash receipts and disbursements basis. Huff and his wife, in making their returns for 1920, each took a deduction on account of the alleged embezzlement by Mabry. The Commissioner of Internal Revenue disallowed those deductions, upon the ground that, as the funds embezzled were not the property of the taxpayers, and as they were not called upon to make good the defalcation until 1921, no loss was sustained by them in 1920. The Board of Tax Appeals reached the same conclusion.

The Revenue Act of 1918 (40 Stat. 1057) contains the following:

"Sec. 212. * * * The net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but * * * if the method employed does not clearly reflect the income, the computation shall be made upon such basis and in such manner as in the opinion of the Commissioner does clearly reflect the income. * * * *"

"Sec. 214. (a) That in computing net income there shall be allowed as deductions: * * *

"(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in trade or business;

"(5) Losses sustained during the taxable year and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, though not connected with the trade or business; but in the case of

a nonresident alien individual only as to such transactions within the United States; * * *

"(7) Debts ascertained to be worthless and charged off within the taxable year. * * * *"

"Sec. 218 (a) That individuals carrying on business in partnership shall be liable for income tax only in their individual capacity. There shall be included in computing the net income of each 'partner his distributive share, whether distributed or not, of the net income of the partnership for the taxable year," etc.

Treasury Regulations 45, art. 111, adopted pursuant to that act, contained the provisions: "A loss from theft or embezzlement occurring in one year and discovered in another is deductible only for the year of its occurrence. * * * If subsequently to its occurrence, however, a tax-payer first ascertains the amount of a loss sustained during a prior taxable year which has not been deducted from gross income, he may render an amended return for such preceding taxable year, including such amount of loss in the deduction from gross income, and may file a claim for refund of the excess tax paid by reason of the failure to deduct such loss in the original return."

 It plainly appears from the language of the statute that the lawmakers did not intend claimed deductions based upon debts to the taxpayer becoming worthless to be treated in the same way as claimed deductions based on losses otherwise sustained by the taxpayer; claimed deductions of the first mentioned kind being allowable only as to "debts ascertained to be worthless and charged off within the taxable year," while allowable claimed deductions of the last-mentioned kind may be based on losses sustained during the taxable year, there being no requirement that the amount of such losses be ascertained during the taxable year. The general requirement is that losses be deducted in the year in which they are sustained. That general requirement calls for a practical, not a legal or technical, test. Where a loss is of a kind not within any prescribed exception, a deduction based on it is allowable before it is absolutely realized, if it is reasonably certain in fact and ascertainable in amount. Lucas v. American Code Co., 280 U. S. 445, 449, 50 S. Ct. 202, 74 L. Ed. 538. The statute and regulations adopted pursuant thereto contemplate the deduction from gross income of losses which are fixed or rendered certain by identifiable events, such as by the destruction of property or deprivation of it by the wrongful or criminal act of another. United States v. S. S.

White Dental Co., 274 U. S. 398, 47 S. Ct. 598, 71 L. Ed. 1120. The above-mentioned Treasury Regulation requiring losses by theft or embezzlement to be deducted from gross incomes of the year in which the theft or embezzlement occurred, whether they are or are not discovered in that year, indicates the adoption of the view that a computation of income for the year in which such a loss occurred would not clearly reflect income, in the absence of a deduction of the amount of loss so sustained. That that view was acquiesced in by the lawmakers is indicated by the facts that the provision authorizing such deduction has been carried forward into subsequent Revenue Acts, and that the above-mentioned regulation has been carried forward into regulations adopted pursuant to later Revenue Acts. The language of the regulation does not indicate that the application of it was intended to be made dependent upon the basis upon which the taxpayer's books of account are kept. If the net income of the taxpayers for the year 1920 could not have been rightly determined without deducting from their gross income the amount of a loss which was rendered certain by an event which occurred in that year, a deduction based on the loss so caused properly could be made in the return for that year, though the amount of the loss was not ascertained until after the expiration of that year. American National Company v. United States, 274 U. S. 99, 47 S. Ct. 520, 71 L. Ed. 946; United States v. Anderson, 269 U. S. 422, 440, 46 S. Ct. 131, 70 L. Ed. 347.

 The above-mentioned trust fund was in the custody and under the control of the partnership. From the time of the receipt by the partnership of the moneys which went into that fund, the partners were jointly and severally liable therefor to the beneficiaries of that fund, the underwriters. Each of the partners was beneficially interested in the preservation of that fund, as it was applicable to the satisfaction of insurance liabilities incurred by the partnership, and as that fund was an asset in the custody of the partnership which protected the partners with reference to their liabilities to the underwriters. In the circumstances of the embezzlement, it was an event which made it certain that Huff, the solvent partner, would lose the amount necessary to be paid by him for the restoration to the trust fund of the amount embezzled. From the time the money was misappropriated Huff was poorer than he was before. It appears from the opinion rendered by the Board of Tax Appeals that

its action in reaching its above-mentioned conclusion was based on the decision in the case of John H. Farish & Co. v. Commissioner of Internal Revenue (C. C. A.) 31 F.(2d) 79. The facts in that case were that an employee of one engaged in a real estate business, consisting principally of collecting rents for clients, in one year misappropriated to his own use moneys so collected, and in a later year the employer, the taxpayer, borrowed the money used in paying to his clients the amount due to them. The court decided that the loss was sustained in the taxable year in which the employer paid to his clients the amount due to them. It appears from the opinion in that case that the stated conclusion was based on the considerations that the moneys embezzled were not the moneys of the taxpayer, but belonged to his clients; that only a liability of the taxpayer was created as each embezzlement occurred; that the creation of such liability was not a loss to the taxpayer, as it might never have been enforced against him; and that he was out nothing until he was called on to make good the defalcation. The reasons given in support of the conclusion reached are fairly subject to criticism on the grounds that the taxpayer became liable for the rents collected when they were collected, that the embezzlement, at the time it occurred, though the money embezzled belonged to the taxpayer's clients, entailed a loss to the taxpayer by depriving him of funds in hand applicable to the satisfaction of his liabilities, and that, in the absence of supporting evidence, it was unreasonable to assume or suppose that the persons entitled to the embezzled money would forego their right to it, or that the embezzlement would keep an honest and solvent taxpayer from voluntarily complying with his obligations. We have not been convinced of the correctness of the decision in the case under consideration. It seems that reality is ignored in saying that a solvent person sustains no loss by a theft or embezzlement of money of another in his possession or custody which he must restore or make good. The effect on the financial condition of Huff of the embezzlement by his financially irresponsible partner was not materially different from what it would have been if the money embezzled had been the individual property of Huff, instead of being money belonging to a trust fund in the custody of the partnership of which he was a member and which was applicable to the satisfaction of liabilities of that partnership. The embezzlement occurred under such circumstances as made it certain that the resulting loss must fall on Huff alone; he being the only financially responsible person to be looked to for the satisfaction of the liabilities of the partnership and the making good of the money embezzled. The fact that Huff did not ascertain the exact amount of the loss resulting from the embezzlement until during the calendar year after it occurred did not keep the loss from being sustained at the time the embezzlement occurred. Lewellyn v. Elec. Reduction Co., 275 U. S. 243, 247, 48 S. Ct. 63, 72 L. Ed. 262. The loss to Huff was rendered certain by events which occurred entirely in 1920, only the amount of the loss remaining unascertained until after the expiration of that year. In the circumstances of the instant case, when that year ended, there was no real uncertainty about the loss by reason of a possibility of Huff's liability for the embezzled money not being enforced. The business in which the partnership was engaged being one subject to public supervision for the protection of the interests of policyholders and underwriters, the possibility of Huff—the only financially responsible person to be looked to—not being called on to make good the amount embezzled well may be deemed too remote to be seriously considered. Besides, there was no evidence indicating that at any time he was willing to shirk his responsibility.

We conclude that the loss from the embezzlement was sustained in 1920, and that the fact that the money embezzled belonged to a trust fund, a wrongful depletion of which had to be made good by a solvent taxpayer who occupied the position of a trustee, did not keep the loss from being one to which the above set out provisions of a Treasury Regulation were applicable.

The petition is granted, and the cause is remanded for further proceedings not inconsistent with this opinion.

FOSTER, Circuit Judge, dissents.